09 CV 4744

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL ISAAC, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> OPPENHEIMER AMT-FREE NEW YORK MUNICIPALS, OPPENHEIMER FUNDS, INC., JOHN V. MURPHY, CLAYTON K. YEUTTER, BRIAN W. WIXTED, MATTHEW P. FINK, ROBERT G. GALI, PHILLIP A. GRIFFITHS, MARY F. MILLER, JOEL W. MOTLEY, KENNETH A. RANDALL, RUSSEL S. REYNOLDS, JR., JOSEPH M. WIKLER, PETER I. WOLD and BRIAN F. WRUBLE, <br><br> Defendants. | CIVIL ACTION NO. <br><br> CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br> **JURY TRIAL DEMANDED** |

Plaintiff, by his attorneys, alleges the following upon personal knowledge as to himself and his own acts and upon information and belief based upon the investigation of Plaintiff's attorneys as to all other matters. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## SUMMARY OF ACTION

1.  This is a class action on behalf of purchasers of shares of Oppenheimer AMT-Free New York Municipals (the "Fund"), an open ended mutual fund that purported to invest mainly in New York municipal securities that pay interest exempt from federal and New York personal income taxes. The Fund offered Class A, B and C shares (OPNYX, OPYBX, and OPYCX, respectively).

2. Contrary to the disclosures made by the Fund to the investing public in its Securities and Exchange Commission ("the "SEC") filings and other public disseminations during the Class Period (defined below), the Fund employed strategies designed to enhance its reported returns while, at the same time, these strategies exposed the Fund to a much greater risk of price declines in the value of its portfolio securities in the event of illiquidity in the market for municipal securities. However, the prospectuses and other sales materials employed by the Fund, in selling and marketing its services and product, failed to disclose that these very strategies exposed the Fund to substantially greater risk of loss should the Fund be forced to sell large blocks of portfolio securities at disadvantageous times at prices reduced from those at which the securities were previously carried on the Fund's books.

3. These previously undisclosed risks first came to light in a prospectus supplement filed with SEC on October 21, 2008 (the "October 2008 Prospectus Supplement"), following a precipitous decline in the value of the Fund's shares, which materially exceeded the decline in value experienced by a peer group of municipal bond funds that did not employ the same risky strategies employed by the Fund. Plaintiff purchased shares of the Fund issued pursuant to prospectuses which failed to disclose the relevant risk factors, which resulted in this financial loss, and is bringing this action on his own behalf and on behalf of a class (the "Class") of similarly situated investors to recover damages.

## JURISDICTION AND VENUE

4. The claims asserted herein arise under Section 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act" or the "1933 Act"), 15 U.S.C. §§77k, 77l(a)(2) and 77o. Jurisdiction is conferred by Section 22 of the Securities Act, 15 U.S.C. §77v. Venue is

proper pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District and Plaintiff, and most of the class members reside in the District.

**PARTIES**

5. Plaintiff purchased shares of the Fund as detailed in the attached Certification and was damaged thereby.

6. Defendant Oppenheimer AMT-Free New York Municipals is a Massachusetts Trust with its principal place of business located at 6803 South Tucson Way, Centennial, Colorado 80112-3924. It is a diversified management investment company registered with the SEC.

7. Defendant Oppenheimer Funds, Inc. ("Oppenheimer"), a Colorado corporation with its principal place of business located at Two World Financial Center, 225 Liberty Street, 11th Floor, New York, New York 10281, is a registered investment adviser with the SEC and the Fund's investment adviser responsible for choosing the Fund's investments and handling its day-to-day business. Oppenheimer earns an advisory fee based on the net assets of the Fund.

8. Defendant John V. Murphy ("Murphy") is a Trustee of the Fund and is also the Chairman, Chief Executive Officer and a Director of Oppenheimer and signer of the Registration Statements, discussed below.

9. Defendants Clayton K. Yeutter ("Yeutter"), Brian W. Wixted, Matthew P. Fink, Robert G. Gali, Phillip A. Griffiths, Mary F. Miller, Joel W. Motley, Kenneth A. Randall, Russel S. Reynolds, Jr., Joseph M. Wikler, and Peter I. Wold are or were Trustees of the Fund and signers of the Registration Statement, and Prospectuses filed with the SEC on January 27, 2006.

Except for Defendant Yeutter, each of the Defendants also signed the other Registration Statements discussed herein.

10. Defendant Brian F. Wruble ("Wruble") is a Trustee of the Fund, oversees 67 portfolios in the Oppenheimer Funds complex and signed the Registration Statements and Prospectuses filed with the SEC on January 27, 2006, March 2, 2007, and November 21, 2007. Defendants Murphy and Wruble also serve on the Boards of over 60 Oppenheimer funds.

11. The defendants name in ¶¶ 8-10 are hereafter referred to as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

12. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased the Class A, B, and C Shares of the Fund from May 21, 2006 through and including October 21, 2008 ("Class Period") and who were damaged thereby, excluding Defendants, the officers and directors of the Fund, members of the Defendants' immediate families and the Defendants' legal representatives, heirs, successors, and assigns, and any entity in which any of the Defendants have or had a controlling interest or unique contractual arrangement.

13. Members of the Class are so numerous that joinder of all members is impracticable. Although the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, based upon the size of the Fund, it is likely that there are thousands of Class members. Members of the Class may be identified from records maintained by the Fund, Oppenheimer or their agents, and may be notified of the

pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

14.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class sustained damages because of Defendants' unlawful activities alleged herein. Plaintiff retained counsel competent and experienced in class and securities litigation and intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by the Plaintiff. Plaintiff has no interests which are contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

15.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

16.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

>    (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
>    (b)     whether Defendants misstated and/or omitted to state material facts in their prospectuses and registration statements filed with the SEC; and
>
>    (c)     whether the members of the Class have sustained damages as a result of Defendants' conduct and the proper measure of such damages.

## SUBSTANTIVE ALLEGATIONS

17. New York has a relatively high rate of income tax. As a result, investing in municipal bonds exempt from federal, state and city taxes, popularly known as "triple tax free bonds," is a popular investment alternative for many New York residents. Municipal bonds are fixed- income securities primarily issued by states, cities, counties and other governmental entities to finance the development of local communities.

18. New York residents seeking to invest in triple tax free bonds have a relatively wide variety of investment options. They can purchase bonds directly or they can buy shares of mutual funds which invest in those bonds. The mutual funds, in turn, can be either closed-end or open-end funds. Closed-end funds generally have a fixed number of shares which trade on a stock exchange, just like regular stocks. The price an investor pays for those funds can be either greater, less than or equal to the fund's net asset value ("NAV"), *i.e.*, the total recorded value of the assets owned by the fund divided by the number of shares outstanding. In contrast, open-end funds continuously offer their shares for sale to members of the investing public pursuant to prospectuses filed as part of registration statements with the SEC and, at the same time, offer to redeem or buy back those shares at the same quoted NAV.

19. The Fund is an open-ended mutual fund and one of the largest such mutual funds specializing in federal and New York tax free investments. The Fund is sold through an extensive network of financial advisers compensated based upon sales commission and/or asset management fees.

20. The Fund has been successful in this arena because of its reporting superior historical returns. These superior returns were, in turn, largely generated by the Fund investing

6

up to 20% of its assets in derivative securities known as "inverse floaters," derivative instruments that pay interest at rates that move in the opposite direction of yields on short-term securities.

21.     Inverse floaters, such as those employed by the Fund, are generally created by depositing a long-term bond into a trust which is used to provide collateral for short term securities issued based upon the security of the long-term instrument. Short-term municipal bond rates are lower than the long term rates earned on the underlying instrument which serves as the basis for creating the trust. This allows for a leveraged or increased return to the fund creating the trust.

22.     Under inverse floater agreements, if the remarketing agent that offers the short-term securities is unable to sell them or if the holders tender (or put) them for repayment of principal and the remarketing agent is unable to remarket them, the remarketing agent may cause the trust to be collapsed, in which case the fund is required to repay the principal amount of the tendered securities. In order to do so, the fund is forced to sell securities from its portfolio regardless of market conditions.

23.     In the case of the Fund, it was a collapse of inverse floaters that forced the Fund to rapidly sell large blocks of securities held in its portfolio in order to satisfy its contractual obligations. In so doing, the Fund was forced to accept prices far below the values at which the bonds were carried on its books.

24.     Although, this risk factor was always present wherever inverse floaters were employed, the Fund's Prospectus, which was made a part of its registration statement filed with the SEC on or about January 26, 2006, made misleading disclosure of this significant risk. In the Section entitled "Main Risks of Investing in the Fund," this Prospectus stated:

Inverse Floaters. Variable rate bonds known as "inverse floaters" pay interest at rates that move in the opposite direction of yields on short-term bonds in response to market changes. As interest rates rise, inverse floaters produce less current income, and their market value can become volatile. Inverse floaters are a type of "derivative security." Some have a "cap," so that if interest rates rise above the "cap," the security pays additional interest income. If rates do not rise above the "cap," the Fund will have paid an additional amount for a feature that proves worthless. The Fund will not invest more than 20% of its total assets in inverse floaters.

25. The Fund's Prospectuses dated and filed with the SEC on or about January 26, 2007 and December 28, 2007, contained the following additional disclosures under the heading "Main Risks of Investing In the Fund":

> The Fund may enter into a "shortfall and forbearance" agreement with the sponsor of an inverse floater held by the Fund. Under such an agreement, on liquidation of the trust, the Fund would be committed to pay the trust the difference between the liquidation value of the underlying security on which the inverse floater is based and the principal amount payable to the holders of the short-term floating rate security that is based on the same underlying security. The Fund would not be required to make such a payment under the standard terms of a more typical inverse floater. Although entering into a "shortfall and forbearance" agreement would expose the Fund to the risk that it may be required to make the payment described above, the Fund may receive higher interest payments than under a typical inverse floater.

26. Full disclosure of the actual relevant risks associated with Inverse Floaters was not made until the filing of a Prospectus Supplement on October 21, 2008 (the "October 2008 Prospectus Supplement"), which replaced existing disclosures concerning "Inverse Floater" with the following:

> Inverse Floaters
>
> The Fund may invest in inverse floaters to seek greater income and total return. The Fund will not expose more than 20% of its total assets to the effects of leverage from its investments in inverse floaters. An inverse floater is a derivative instrument, typically created by a trust that divides a fixed-rate municipal security into two securities: a short-term tax exempt floating rate security (sometimes

8

referred to as a "tender option bond") and a long-term tax exempt floating rate security (referred to as a "residual certificate" or "inverse floater") that pays interest at rates that move in the opposite direction of the yield on the short-term floating rate security. The purchaser of a "tender option bond" has the right to tender the security periodically for repayment of the principal value. As short-term interest rates rise, inverse floaters produce less current income (and, in extreme cases, may pay no income) and as short-term interest rates fall, inverse floaters produce more current income.

To facilitate the creation of inverse floaters, the Fund may purchase a fixed-rate municipal security and subsequently transfer it to a broker-dealer (the sponsor), which deposits the municipal security in a trust. The trust issues the residual certificates and short-term floating rate securities. The trust documents enable the Fund to withdraw the underlying bond to unwind or "collapse" the trust (upon tendering the residual certificate and paying the value of the short- term bonds and certain other costs). The Fund may also purchase inverse floaters created by municipal issuers directly or by other parties that have deposited municipal bonds into a sponsored trust.

The Fund's investments in inverse floaters involve certain risks. The market value of an inverse floater residual certificate can be more volatile than that of a conventional fixed-rate bond having similar credit quality, maturity and redemption provisions. Typically, inverse floater residual certificates tend to underperform fixed rate bonds when long-term interest rates are rising but tend to outperform fixed rate bonds when long-term interest rates are stable or falling. Inverse floater residual certificates entail a degree of leverage because the trust issues short-term securities in a ratio to the residual certificates with the underlying long-term bond providing collateral for the obligation to pay the principal value of the short-term securities if and when they are tendered. If the fund has created the inverse floater by depositing a long-term bond into a trust, it may be required to provide additional collateral for the short-term securities if the value of the underlying bond deposited in the trust falls.

An inverse floater that has a higher degree of leverage is typically more volatile with respect to its price and income than an inverse floater having a lower degree of leverage. **Under inverse floater arrangements, if the remarketing agent that offers the short-term securities for sale is unable to sell them, or if the holders tender (for put) them for repayment of principal and the remarketing agent is unable to remarket them, the remarketing agent may cause the trust to be collapsed, and in the case of floaters created by the Fund, the Fund will then be required to repay the principal amount of the tendered securities. During times of market volatility, illiquidity or**

**uncertainty, the Fund could be required to sell other portfolio holdings at a disadvantageous time to raise cash to meet that obligation.**

Some inverse floaters may have a "cap," so that if interest rates rise above the cap, the security pays additional interest income. If rates do not rise above the cap, the Fund will have paid an additional amount for that feature that has proved worthless. (Emphasis added).

27.  The Prospectuses filed with the SEC prior to the October 2008 Supplemental Prospectus generally disclosed that some derivatives may be illiquid and the Fund may have difficulty selling them quickly at acceptable prices, *i.e.*, the Fund may have to hold the inverse floaters until maturity or sell them slowly over time. However, undisclosed prior to the October 2008 Supplemental Prospectus was the material risk that the owners of the short-term securities sold by the trust created for the purpose of issuing inverse floaters could effectively collapse the trusts and require the underlying securities to be sold immediately forcing the sale of portfolio securities at disadvantageous times and prices.

28.  These conditions caused a sharp decline in the value of the Fund's shares. Thus, the NAV of the Class A shares declined from a closing price of $13.22 on May 21, 2006 to close at $9.10 per share on October 21, 2008.

## COUNT I

### Violations of Section 11 of the Securities Act Against Defendants

29.  Plaintiff repeats and realleges each and every allegation above as if set forth fully herein. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, against Defendant the Fund and the Individual Defendants. This claim is not based on and does not sound in fraud and is based upon strict liability.

30. This claim is brought by Plaintiff on his own behalf and on behalf of other members of the Class who acquired the Fund's shares during the Class Period pursuant to prospectuses and supplements filed with the SEC on: January 26, 2006, January 26, 2007, and December 28, 2007, as described above all of which were filed with or pursuant to Registration Statements (the "Registration Statements and Prospectuses"). Each Class member acquired his/her/its shares pursuant to the relevant Registration Statements and Prospectuses.

31. The Fund is the issuer of the securities through the Registration Statements and Prospectuses. The Individual Defendants signed, either personally or through an attorney-in-fact, at least one of the Registration Statements that were materially false and/or misleading.

32. Defendants owed to the purchasers of the stock obtained through the Registration Statements and Prospectuses the duty to make certain that all relevant material risk factors potentially affecting the Fund's performance were disclosed in the Registration Statements at the time the Registration Statements became effective to ensure that such statements were true and correct, and that there was no omission of material facts required to be stated in order to make the statements contained in the Registration Statements not misleading.

33. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were true or that there was no omission of material fact necessary to make the statements made therein not misleading.

34. Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statements and Prospectuses, which misrepresented or

failed to disclose, *inter alia,* the facts set forth above. By reason of the conduct herein alleged, each Defendant violated Section 11 of the Securities Act.

35.     The Fund is the issuer of the stock sold pursuant to the Registration Statements and Prospectuses. As issuer of the stock, the Fund is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

36.     At the times they obtained their shares of the Fund, Plaintiff and the other members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

37.     This action is brought within one year after discovery in this or a related action of the untrue statements and omissions in and from the Registration Statements and Prospectuses that should have been made through the exercise of reasonable diligence, and within three years of the time that the securities upon which this Count is brought were offered to the public.

38.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act Against Defendant Oppenheimer

39.     Plaintiff repeats and realleges each and every allegation above as if set forth fully herein. This Count is brought for violation of Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), against Oppenheimer.

40. As set forth more specifically above, the Prospectuses failed to disclose material facts necessary in order to make the statements, in light of the circumstances in which they were made, not misleading.

41. Oppenheimer, through its agents, sold and/or solicited the sale of the Fund shares offered pursuant to the Registration Statements and Prospectuses set forth above for its financial gain. Plaintiff and the other members of the Class did not know, nor could they have known, of the untruths or omissions contained in the Registration Statements and Prospectuses, including that the price of the Fund's shares were not properly determined.

42. The Defendants named in this Count were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectuses to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectuses were accurate and complete in all material respects.

43. This claim was brought within one year after discovery in this or a related action of the untrue statements and omissions in and from the Prospectus that should have been made through the exercise of reasonable diligence, and within three years of the time that the securities upon which this Count is brought were offered to the public by way of a Prospectuses. By reason of the misconduct alleged herein, Oppenheimer violated Section 12(a)(2) of the Securities Act and is liable to Plaintiff and other members of the Class who purchased or acquired the Fund's shares by way of the Prospectuses, each of whom has been damaged as a result of such violations.

y

44.     Plaintiff and the other members of the Class who purchased the Fund's shares pursuant to the Prospectuses hereby seek rescission of their purchases and hereby tender to Oppenheimer those shares which Plaintiff and other members of the Class continue to own in return for the consideration paid for those securities, together with interest thereon.

## COUNT III

### Violations of Section 15 of the Securities Act Against Oppenheimer

45.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is not based on and does not sound in fraud.

46.     This claim is asserted against Oppenheimer which, by virtue of being the Fund's manager and responsible for choosing the Fund's investments and handling its day-to-day business, was a control person of the Fund during the relevant time period. Oppenheimer was in a position to control, and did control, the inclusion of the false and incomplete statements and omissions in the Registration Statements and Prospectuses.

47.     For the reasons set forth above, Oppenheimer is liable to Plaintiff and the members of the Class who purchased the Fund's shares based on the untrue statements and omissions of material fact contained in the Registration Statements and Prospectuses and who were damaged thereby.

48.     Oppenheimer did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statements and Prospectuses were accurate and complete in all material respects. Had it exercised reasonable care, Oppenheimer could have known of the material misstatement and omissions alleged herein.

49. This claim was brought within one year after the discovery of the untrue statements and omissions in the Registration Statements and Prospectuses and within three years after the Fund's shares were sold to the Class in connection with the Offerings. By reason of the misconduct alleged herein, for which the Fund is primarily liable, as set forth above, Oppenheimer is jointly and severally liable with and to the same extent as the Fund pursuant to the Securities Act.

## BASIS FOR INFORMATION AND BELIEF

50. Plaintiff's information and belief is based upon, among other things, a review of relevant filings made with the SEC, a review of pricing information with respect to the Fund and competing funds, news reports and press releases.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all other members of the Class, prays for judgment as follows:

(a) declaring this action to be a class action properly maintained pursuant to the Federal Rules of Civil Procedure, certifying the Class with Plaintiff as Class Representative, and certifying Plaintiff's counsel as Class Counsel;

(b) awarding Plaintiff and the other members of the Class damages against Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiff and the other members of the Class rescission on Count II to the extent they still hold Fund shares, or if sold, awarding rescissory damages in accordance with Section 12(a)(2) of the Securities Act from the Defendants named in that Count;

(d) awarding Plaintiff and the other members of the Class their costs and expenses of this litigation, including reasonable attorneys', accountants', and experts' fees and other costs and disbursements; and

(e) awarding Plaintiff and the other members of this Class such other and further relief as may be just and proper under the circumstances.

### JURY TRIAL DEMANDED

Plaintiff hereby demand a trial by jury.

Dated: New York, New York
May 20, 2009

By: _____
Joseph H. Weiss
Mark D. Smilow
WEISS & LURIE
551 Fifth Avenue
New York, New York 10176
(212) 682-3025
(212) 682-3010 (Fax)

Attorneys for Plaintiff

CERTIFICATION OF PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

MICHAEL ISAAC ("Plaintiff"), hereby certifies as follows:

1. I have reviewed the complaint being filed on my behalf and on behalf of all others similarly situated and authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. To the best of my current knowledge, I purchased the following Class A shares of Oppenheimer AMT Free New York Municipals during the class period referenced in the complaint:

| Date | Purchased or Sold | No. of Shares | Price per Share |
|---|---|---|---|
| 06-05-06 | P | 1,495.886 | $13.37 |
| 08-29-06 | P | 456.554 | $13.58 |
| 10-26-06 | P | 496.35 | $13.70 |
| 02-23-07 | P | 1,086.169 | $13.81 |

5. I have not served as a class representative in a federal securities case in the last three years.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

7. The matters stated in this certification are true to the best of my current knowledge, information and belief.

8. I hereby certify, under penalty of perjury, that the foregoing is true and correct.

DATED:   May 18, 2009

_____
MICHAEL ISAAC